IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CHARLOTTE GEARHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:19-cv-00370 |
| | ) | |
| THE DEPARTMENT OF VETERANS AFFAIRS | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| | ) | |
| and | ) | |
| | ) | |
| DENIS McDONOUGH,[1] in his official capacity as Secretary of the Department of Veterans Affairs, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Former Department of Veterans Affairs (VA) employee Charlotte Gearhart sued the VA and the acting Secretary of the VA, Denis McDonough, alleging that the department violated the Rehabilitation Act by failing to properly accommodate her circadian rhythm sleep disorder and creating a hostile work environment. Both parties moved for summary judgment. (Dkt. Nos. 31, 33.) The motions have been fully briefed and argued. For the reasons that follow, the court will deny Gearhart's motion for summary judgment and grant defendants' motion for summary judgment.

---

[1] The parties agree that Denis McDonough should be substituted for Robert Wilke as the defendant in this suit pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

I.  BACKGROUND

**A.  Gearhart's Accommodation**

Plaintiff Charlotte Gearhart worked as an Administrative Officer on Duty (AOD) in the Health Administration Service unit at the VA hospital located in Salem, Virginia.  Gearhart and the four other AODs, employed during the relevant period, provided 24-hour coverage for their supervisors and other administrative support services.  The AODs rotated workdays every seven days as well as shifts (day, evening, night) on workdays.  AODs would work five days and then have two days off.  The AODs collaborated to create their own schedule, which was typically made two or three months in advance.  Christina Beaver was the AODs first-level supervisor until November 2013 when Janet Zellis took the position.

In September 2013, Dr. Garry Kuiken, Gearhart's primary care physician, diagnosed her with "circadian rhythm sleep disorder,"[2] which manifested by "insomnia, chronic fatigue, chronic malaise, impaired co-ordination, and a host of mental issues including mood swings, poor concentration and impaired judgment."  (Defs.' Ex. 3, Dkt. No. 34-1; R. 00494, Pl.'s Ex. 1[3] 68, Dkt. No. 32-1.)  Dr. Kuiken provided Gearhart with a note that read, "Please restrict [Gearhart's] work schedule to midnight shift only.  No swing shifts are advisable."  (Defs.' Ex. 4, Dkt. No. 34-1.)  Gearhart provided the note to her first-level supervisor Beaver the next day. (Defs.' Ex. 5, Dkt. No. 34-1.)  Beaver told Gearhart she would need to seek accommodation

---

[2] For the purposes of their motions, the parties do not contest whether this condition qualifies as a disability under the Rehabilitation Act

[3] Plaintiff's Exhibit 1 contains documents from the administrative record in this case.

through the Reasonable Accommodation Board (RAB)[4] and accompanied Gearhart to Human Resources (HR) to initiate the process.  (Beaver Dep. 7:1–6, Defs.' Ex. 6, Dkt. No. 34-1.) Gearhart submitted a Written Confirmation of Request for Accommodation form on September 30, 2013, which listed "medical issues" as the reason for the request.  (Defs.' Ex. 7, Dkt. No. 34-1.)

Two days later, on October 1, Beaver held a meeting with a majority of the AODs present, including Gearhart.  One of the items on the agenda referred to Gearhart's request—"Charlotte midnight shift only.  Need to look at schedule ASAP."  (R. 00726, 00727, Dkt. No. 32-1.)  When this agenda item came up at the meeting, some of the other AODs made sarcastic remarks and were upset by the request.  (Beaver Dep. 15–16, Pl.'s Ex. 6, Dkt. No. 32-6; McCall Dep. 9–10, Pl.'s Ex. 10, Dkt. No. 32-10.)  Gearhart described the meeting as one filled with "venom."  (Gearhart Dep. 57, Pl.'s Ex. 7, Dkt. No. 32-7.)  A day after the meeting, Beaver sent an email, with Gearhart copied, that stated, "[Gearhart] has stated she will work her day shift on weekends.  If she is scheduled days during the week and [doesn't] come in, she'll have to take [sick leave] . . . .  When [Gearhart] is scheduled to work days . . . please make sure someone else is too in the event she calls out [sick]."  (Defs.' Ex. 14, Dkt. No. 34-1.)

In a letter dated October 9, 2013, Dr. Kuiken opined "that the swing shift schedule is directly contributing to [Gearhart's symptoms] . . . .  Therefore I requested Charlotte be restricted to a single shift.  She prefers the midnight to 8 a.m. shift, which previously she was assigned for many years."  (Defs.' Ex. 3, Dkt. No. 34-1.)  Two days later, Gearhart was notified that the RAB would be meeting on October 17.  (Azar Dep. 30–31, Pl.'s Ex. 3, Dkt. No. 32-3.)

---

[4] At that time, Brian Zeman, the Chief of HR, and five others, who had roles of employee/labor relations specialist, occupational health physician, federal employee union representative, and EEO manager, comprised the RAB.  (Zeman Dep. 5:2–11, Defs.' Ex. 8, Dkt. No. 34-1.)

On November 4, Gearhart received a letter, dated November 1, from Zeman on behalf of the RAB requesting additional medical documentation.  (R. 00507, Dkt. No. 32-1 ("In order for the Board to fully evaluate your request, additional medical documentation is required.").  On November 25, Gearhart provided the requested medical information via a letter from Dr. Kuiken; the letter explained, "A single consistent shift would alleviate the circadian rhythm disturbance . . . .  Since [Gearhart] successfully worked night shift for many years, this would be the shift of choice."  (R. 00496, Dkt. No. 32-1.)

In the interim, on November 7, Gearhart requested via email that Beaver modify the schedule prior to the conclusion of the RAB process.  (Defs.' Ex. 12, Dkt. No. 34-1.)  Additionally, Gearhart explained, "A second issue is in regard[] to my eagerness to please by agreeing to work day shift weekends (Saturday and Sunday) . . . .  We concluded . . . that I will use [sick leave] for [weekday day shifts].  However, my physician remains steadfast that I do not participate in swing shifts.  So, I will also put in [sick leave] for all Saturday and Sunday day shifts, as this wait continues.  As it is, I am still working my evening and midnight shifts."  (*Id.*)  Finally, Gearhart stated, "I am pleading with you to allow me to follow my doctor's prescription, to work midnights only (a continuous, permanent shift) . . . .  The longer this process takes, the more [sick leave] I will have to use.  Although, I am more than willing to use my [sick leave] in order to achieve good health."  (*Id.*)  Beaver responded on November 13: "Charlotte, per our conversation the first time you mentioned this, I informed you I would not make any decision regarding this matter . . . .  I [told] you because there were 4 other employees involved, I could not make any decisions without having a negative impact with the [union] . . . .  I had already approved leave for your co-workers and it is not fair for them to have to change their leave.  You

told me in our first discussion that you were willing to keep to the already made schedule until after the first of the year." (Defs.' Ex. 9, Dkt. No. 34-1.)

The RAB approved the accommodation on January 2, 2014. (Dkt. No. 32-4 at 62.) Specifically, the RAB approved Gearhart's "request for accommodation for a consistent shift assignment." (*Id.*) After approval, Gearhart, the other AODs, and Zellis engaged in the process of determining a new schedule that implemented Gearhart's consistent shift accommodation. (*See* Defs.' Ex. 20, Dkt. No. 34-1.) In mid-February, Zellis emailed the AODs providing the new schedule, explaining that it would begin on March 9, and that it would be in place for 90 days. [5] (*Id.*) The schedule had Gearhart working a fixed schedule of midnight shift Monday–Friday with the weekends off. (Defs.' Ex. 22, Dkt. No. 34-1.) Gearhart states that she received a pamphlet entitled "Managing Your Pain" in her mailbox four days after the new schedule was implemented, but she does not provide a cite to the record or indicate that she knows the source.

In June, after the 90-day period ended, Zellis and the AODs again engaged to create a new schedule. Zellis solicited feedback from all AODs, including Gearhart. The other AODs expressed frustration at working 12-hour shifts, particularly a midnight-to-noon shift, in order to provide necessary coverage. (*See* Defs.' Ex. 23, Dkt. No. 34-1.) One AOD explained that the majority of AODs were "extremely unhappy" and that the most recent schedule "just isn't working for most of [the AODs]." (*Id.*) Two AODs also said Gearhart was "not a team player." (*Id.*) Zellis testified that she viewed one email as "harassment." (R. 00347, Dkt. No. 32-1.) Zellis proposed for consideration schedules produced by Gearhart. (Defs.' Ex. 21, Dkt. No. 34-1.) Ultimately, a new schedule was adopted that had Gearhart working a midnights-only fixed shift from Tuesday through Saturday instead of Monday through Friday. (*Id.*) Gearhart's

---

[5] Gearhart insists that she was not made aware of the 90-day period of the new schedule; however, she is copied on the email sent on February 19.

schedule was not accepted as Zellis noted it had other AODs "doubling back and working seven days in a row." (*Id.*)

Gearhart insisted that changing the schedule violated the terms of her accommodation. (Defs.' Ex. 25, Dkt. No. 34-1.) Zellis disagreed. (*Id.*) On June 11, Gearhart provided another letter from Dr. Kuiken; he opined that Gearhart's "health requires that she remain on her current shift @ work which is: Sunday p.m. thru Friday a.m. (midnight to 8 a.m.)." (Defs.' Ex. 29, Dkt. No. 34-1.) On June 13, Gearhart wrote to the Salem VA Director, Dr. Miguel Lapuz, about her concern; he responded that HR had reviewed her concern and concluded the new schedule was consistent with RAB's initial approval of a reasonable accommodation. (Defs.' Ex. 26, Defs.' Ex. 30, Dkt. No. 34-1.) On June 16, Gearhart initiated another reasonable accommodation request and informed management that she planned to take sick leave on the shifts she deemed inconsistent with her initial accommodation. (Defs.' Ex. 27, Dkt. No. 34-1.)

On June 17, Zellis asked for all of the AODs to look at the schedule again in an attempt to accommodate Gearhart's request. (Defs.' Ex. 31, Dkt. No. 34-1.) The other AODs did not agree, citing several frustrations. (*Id.*) On July 2, the RAB notified Gearhart that her second request was denied because it would not be effective, would be difficult to provide, and would cause undue hardship and alter the nature of the unit's operation. (Defs.' Ex. 32, Dkt. No. 34-1.) Gearhart appealed; her appeal was denied by Dr. Teresa England on August 8. Gearhart worked midnight shifts from Tuesday through Saturday until November 2016. (Case No. 7:20-cv-365, Dkt. No. 1; Defs.' Ex. 2, Dkt. No. 34-1.)

During the relevant period, Gearhart used 266 hours—approximately 6.5 weeks—of sick leave to work her desired schedule. Nothing in the record indicates that Gearhart was ever

denied leave.  On one occasion in July, Gearhart was marked AWOL; however, that decision was reversed.

On or about July 28, 2014, Gearhart contacted an Equal Employment Opportunity (EEO) counselor regarding the filing of a complaint concerning reasonable accommodation, time and attendance, harassment, and hostile work environment claims.  (Defs.' Ex. 35, Dkt. No. 34-1.) After finishing informal counseling on August 25, 2014, Gearhart filed an EEO complaint on September 5, 2014.  (Defs.' Ex. 36, 38, Dkt. No. 34-1.)   Following the completion of an investigation, the EEOC administrative judge granted summary judgment in favor of the agency on February 15, 2019.  (Defs.' Ex. 41, Dkt. No. 34-1.)  On February 28, 2019, the Agency issued a Final Agency Decision to accept and fully implement the decision.  (Pl.'s Ex. 1, Compl., Dkt. No. 1.)

**B.  VA Guidance on Accommodations**

The VA Handbook provides policies for "Processing Requests for Reasonable Accommodation from Employees and Applicants with Disabilities."  (*See* Pl.'s Ex. 4, Dkt. No 32-4.)  The November 27, 2013 VA policy provided time frames for processing requests; specifically:

> All requests for accommodation should be processed as expeditiously as feasible.  Requests from applicants should be expedited and processed within ten (10) calendar days.  Requests from employees should ordinarily be processed within thirty (30) calendar days, not counting the time waiting for medical documentation.  The U.S. Equal Employment Opportunity Commission has ruled that when a disability is known and the accommodation can be easily provided, failure to process the accommodation request quickly could constitute undue delay in violation of the Rehabilitation Act.

(Pl.'s Ex. 4 17.)  The policy also explains that while an accommodation is being processed, the VA should provide an interim workplace adjustment; specifically:

> Where possible, within thirteen (13) calendar days of the initial request, interim workplace adjustments will be made until a final decision has been made on the request for accommodation. The interim workplace adjustment should enable the individual to perform the essential functions of the job or enjoy the benefits and privileges of employment without posing a direct threat to anyone's health and safety. If interim workplace adjustment is not possible, a written explanation to the employee or applicant shall be provided.

(*Id.*)

## C. Procedural History

Gearhart sued the defendants pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.* Gearhart brings the following counts related to the VA's treatment of her disability: (1) discrimination on the basis of disability; (2) failure to accommodate; (3) unreasonable delay, including bad faith, in approving and implementing a reasonable accommodation; (4) discriminatory and retaliatory hostile environment; and (5) retaliation based on disability. (Compl. ¶ 39, Dkt. No. 1.)

Gearhart and defendants moved for summary judgment on all counts. (Dkt. Nos. 31, 33.) Both motions were fully briefed and argued.[6]

### III.  ANALYSIS

## A. Summary Judgment Standard

Summary judgment is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material facts to resolve. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The court must take care to

---

[6] At the hearing on the motions, the government withdrew its argument that Gearhart failed to exhaust her administrative remedies.

resolve all factual disputes and any competing, rational inferences in the light most favorable

non-moving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal

quotations omitted).  Once the moving party has met this burden, the adverse, or non-moving

party, must set forth specific facts showing that there is a genuine issue for trial. *Id.*  The adverse

party may not rest on mere allegations, denials, or unsupported assertions, but must, through

affidavits or otherwise, provide evidence of a genuine dispute. *Anderson*, 477 U.S. at 248-49.  In

other words, the nonmoving party must show "more than…some metaphysical doubt as to the

material facts," for the mere existence of a scintilla of evidence in support of its position is

insufficient to survive summary judgment." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  Because both parties in this case have moved for summary judgment,

the court is to consider "each motion separately on its own merits to determine whether either of

the parties deserves judgment as a matter of law." *Bacon v. City of Richmond*, 475 F. 3d 633,

637-38 (4th Cir. 2007) (internal quotation omitted).

## B.  Discrimination and Retaliation on the Basis of Disability (Counts I and V)

To establish a prima facie case of disability-based discrimination, Gearhart must show

that she (1) is disabled within the meaning of the Act, (2) was otherwise qualified for the

position; and (3) suffered an adverse employment action on the basis of disability. *Doe v. Univ.

of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995).  A claim of retaliation

similarly requires an adverse employment action. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 271

(4th Cir. 2001).  An adverse employment action is a "discriminatory act which adversely affects

the terms, conditions, or benefits of the plaintiff's employment."[7] *James v. Booz-Allen &

Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2007).

---

[7] The Fourth Circuit has acknowledged the general principle that the Rehabilitation Act and the Americans
with Disabilities Act (ADA) are construed to impose the same requirements due to the similarity of the language in

The parties dispute that Gearhart suffered an adverse employment action because of her sleep disorder.[8]  Defendants argue, as a matter of law, Gearhart did not suffer an adverse employment action; alternatively, if she did, she cannot show that it was due to her disability.  In her motion, Gearhart argues that the agency's inaction and failure to follow its own policies regarding her reasonable accommodation request required her to use 266 hours of sick leave,[9] which she contends is an adverse employment action as a matter of law.[10]

The central issue is how to classify Gearhart's use of sick leave.  The defendants contend Gearhart's use of sick leave was voluntary and represented an interim accommodation to allow her to work her desired schedule prior to implementation of a final accommodation.  Gearhart argues she was forced to use these benefits because of the agency's neglect and bad faith.

First, it is clear from the record that Gearhart was at least party to the discussions leading to the decision that she would take sick leave while awaiting a decision from the RAB.  Gearhart testified that during her initial conversation with Beaver, she asked, "So . . . if I am ill and I can't come in because I haven't had any sleep . . . what do I do?  I just use sick leave?  And [Beaver] said, yeah."  (Gearhart Dep. 54:3–15, Pl.'s Ex. 7, Dkt. No. 32-7.)  A little over a month later, in November, Gearhart emailed Beaver to explain, "[t]he longer [the RAB] process takes, the more [sick leave] I will have to use.  Although, I am more than willing to use my [sick leave] in order

---

the two acts.  *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).  For that reason, the court cites interchangeably to cases under the Rehabilitation Act and ADA.

[8] For the purposes of summary judgment, defendants do not contest that circadian rhythm sleep disorder is a disability under the Act or that Gearhart was not otherwise qualified to be an AOD.

[9] Gearhart used 232 hours of sick leave from September 27, 2013, to March 9, 2014.  She took an additional 34 hours of sick leave beginning in July 2014 after the schedule was revised.

[10] In her brief in support of her motion for summary judgment, Gearhart also cites the VA's "failure to follow [its] own policies…[and] failure to consider an interim or temporary accommodation" as evidence of discrimination on the basis of disability.  (*See* Pl.'s Mem. in Support of Mot. for Summ. J. 13, Dkt. No. 32.)  The court finds these facts are more appropriately considered part of Gearhart's failure to accommodate and unreasonable delay claims rather than as evidence of an adverse employment action.  (*See* Compl. ¶ 39(B)&(C).)

to achieve good health."  Beaver responded:  "You told me in our first discussion that you were willing to keep to the already made schedule until after the first of the year."  Given that Gearhart seemingly volunteered to use sick leave to provide an interim accommodation, the court does not find that she suffered an adverse employment action.  *Cf. Laird v. Fairfax Cnty., Va.*, 978 F.3d 887, 894 (4th Cir. 2020) ("If an employee voluntarily requests a transfer, and the employer agrees to it, there is no actionable adverse action.").

Second, while district courts and the Fourth Circuit "have found denials of requests for sick leave to be adverse employment actions where plaintiffs consequently were not paid for their days off,"  *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 494 (D. Md. 2013);  *see Wells v. Gates*, 336 Fed. App'x 378, 384–85 (4th Cir. 2009); *Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 706 (D. Md. 2003), in this case, Gearhart was never denied sick leave, and she was paid for her leave.[11]  *Williams v. Virginia Polytechnic Inst. & State Univ.*, 451 F. Supp. 3d 467, 479 (E.D. Va. 2020) ("While '[p]roviding long-term disability benefits and allowing an employee to utilize those benefits cannot be considered an adverse action,' depriving her of her work and salary, of course, can.").  Indeed, "permitting the use of accrued paid leave" is more likely to be viewed as a reasonable accommodation than an adverse employment action.  *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (citing 29 C.F.R. § 1630.2(o) (Appendix) (2011)); *E.E.O.C. v. Manuf. and Traders Trust Co.,* 429 F. Supp. 3d 89, 103 (D. Md. Dec. 19, 2019).

---

[11] The Fourth Circuit has addressed an argument similar to Gearhart's argument that she only voluntarily took sick leave because of the agency's inaction.  In *Stone v. University of Maryland Medical Systems Corp.*, the Fourth Circuit explained in a Due Process case, "[i]f [an employee] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause."  855 F.2d 167, 173 (4th Cir. 1988).

Gearhart also raises the fact that she was temporarily marked AWOL on one occasion and was publicly criticized by her fellow employees.  The decision to mark Gearhart AWOL was reversed, and, even if it were not, it would not suffice to show an adverse employment action. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (finding that treatment such as not issuing a performance appraisal, not conducting a mid-year review, removal from an office with windows to a shared cubicle, placement on AWOL, and placement on leave restriction are not adverse employment actions).  Furthermore, "ostracism and unfriendly treatment at the hands of [coworkers]" similarly does not constitute an adverse employment action.  *Wilson v. Otto*, 297 F. App'x 681, 682 (9th Cir. 2008); *see also Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001) (holding that a coworkers' refusal to speak to a fellow employee did not constitute an adverse employment action under Title VII).

The court finds that no reasonable jury could find that Gearhart has suffered an adverse employment action through her use of paid sick leave, being temporarily marked AWOL on one occasion, or from criticism she received from her coworkers.  Thus, Gearhart's claims for discrimination and retaliation on the basis of disability fail, and the court will grant defendants' motion for summary judgment with respect to these claims.[12]

## C.  Failure to Accommodate and Unreasonable Delay

Gearhart also sued defendants for failure to accommodate under the Rehabilitation Act. In order to establish a prima facie case for failure to accommodate, Gearhart must show that (1) she has a disability within the meaning of the statute; (2) her employer had notice of this disability; (3) with reasonable accommodations she could perform the essential functions of the

---

[12] Because the court finds that Gearhart has not suffered an adverse employment action, the court does not need to address defendants' contention that even if Gearhart suffered an adverse employment action it was not on the basis of her disability.

position; and (4) the employer refused to make any reasonable accommodation.  *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 414 (4th Cir. 2015).  If Gearhart establishes her prima facie case, the defendants may still avoid liability if they show "as a matter of law that the proposed accommodation will cause undue hardship in the particular circumstances."  *Id.* (internal quotations omitted).

> Notably, regarding the timing of an accommodation, the Fourth Circuit has explained:

> > The Rehabilitation Act does not require an employer to provide the exact accommodation that an employee requests.  Importantly, to comply with the Rehabilitation Act, employers need not immediately implement or accept accommodations proposed by an employee.  Nor must an employer move with maximum speed in addressing a request for accommodations.  But [a]n unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate [her] disability that violates the Rehabilitation Act.

*Farquhar v. McCarthy*, 814 F. App'x 786, 788 (4th Cir. 2020) (per curiam) (internal citations omitted).

Gearhart argues that defendants (1) failed to continue to accommodate her when the initial accommodation schedule was modified and that they rejected Gearhart's second accommodation request; (2) failed to implement an interim accommodation during that period; and (3) unreasonably delayed implementation of a reasonable accommodation from October 2013 to March 2014.  Defendants respond that the July 2014 schedule modification was consistent with Gearhart's approved accommodation; Gearhart was allowed to liberally take sick leave as an interim accommodation; and the delay was not unreasonable as a matter of law.

### 1.  Modification of the Schedule and Denial of Second Request in July 2014

In July 2014, a new schedule went into effect that modified the first accommodation schedule set forth in March 2014.  The modified schedule still provided Gearhart a fixed

schedule of exclusively midnight shifts.  The only difference between the March schedule and the newly approved July schedule was that Gearhart had different days off from work.  The record makes it abundantly clear that Gearhart's initial accommodation request, and the medical documentation she submitted in support of that request, indicated that Gearhart required a consistent *shift*.[13]  There is no evidence in the record that Gearhart's initial request was for fixed set of work days.  The RAB approved Gearhart's request for a consistent shift in January 2014, and the department implemented it in March 2014.  Gearhart worked a consistent shift assignment—her preferred midnight shift—from March 2014 to November 2016.  The defendants were only required to provide a reasonable accommodation, "not a perfect one." *Murphy v. Cnty. of New Hanover*, No. 21-1471, 2021 WL 4704780, at *2 (4th Cir. Oct. 8, 2021). The court finds that the July 2014 modification was not an unreasonable change of Gearhart's accommodation because the initial approved accommodation only required a consistent shift, not fixed working days.  *See id.* ("[T]he medical documentation and [plaintiff's] reasonable accommodation request asked only for an enclosed office, not a private one.").

For similar reasons, the court also finds that the defendants did not unreasonably deny Gearhart's second request for an accommodation.  There is no evidence in the record that shows why having specific days of the week off was necessitated by Gearhart's disability.  The court notes that there is evidence in the record that Gearhart's supervisor considered schedules proposed by Gearhart and provided reasons why those specific schedules were not adopted.  For example, Zellis expressed concern about one of Gearhart's proposed schedules because it had

---

[13] In his initial note in September 2013, Dr. Kuiken requested, "please restrict work schedule to <u>midnight shift only</u>."  (Defs.' Ex. 4, Dkt. No. 34-1 (emphasis in original).)  In Gearhart's written confirmation of her request, which directed her to be as specific as possible, she wrote "midnight shifts only, no swing shifts are [advisable]." (Defs.' Ex. 7, Dkt. No. 34-1.)  Again, in October 2013, Dr. Kuiken requested "[Gearhart] be restricted to a single shift," and specifically, "she prefers the midnight to 8 a.m. shift…" (Defs.' Ex. 3, Dkt. No. 34-1.)  Dr. Kuiken again reiterated the need for a consistent shift, specifically the midnight shift, in late November 2013.  (R. 00496, Dkt. No. 32-1.)

everyone on "split days off" and Zellis felt "all staff need 2 consecutive days off in order to fully appreciate and take advantage of time away from work." (Defs.' Ex. 31 77, Dkt. No. 34-1.) Despite Gearhart's arguments to the contrary, an employer can legitimately consider the impact an accommodation would have on other employees. *See Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) ("[A]n accommodation that would require other employees to work harder is unreasonable."). An employer is not required "to make an accommodation that would impact other employees in their ability to perform their job duties." *Rudolph v. Buncombe Cty. Gov't*, 846 F. Supp. 2d 461, 474 (W.D.N.C. 2012) (citing *Crabill*, 423 Fed. App'x at 323). The record shows that other AODs were required to pick up more shifts, work 12-hour shifts instead of 8-hour shifts, and work several weekends in a row, among other things on the original accommodation schedule. Specifically, one AOD noted how working a 12-hour shift from midnight to noon negatively impacted his ability to perform his job duties. The defendants properly considered these factors at the time of the schedule modification and when the defendants denied Gearhart's second request for accommodation. Further, after the schedule modification in July 2014, Gearhart worked a consistent, fixed schedule of her preferred midnight shift for over two years, until November 2016.[14]

### 2. Failure to Implement an Interim Accommodation

Gearhart also takes issue with what she describes as a lack of interim accommodation while she awaited approval and implementation of her requested accommodation. VA policy provided that "[i]f an accommodation cannot be provided immediately, an interim accommodation should be provided when feasible." (Pl.'s Ex. 4 18, Dkt. No. 32-4.) But "[n]ote that an interim accommodation is not guaranteed; it depends on the employee's job duties and

---

[14] Gearhart filed a separate lawsuit regarding actions taken by defendants between 2016 and 2019. (*See* Civil Action No. 7:20-cv-365).

functional limitations." (*Id.*)  As discussed in the analysis of Gearhart's discrimination and retaliation claims, the court views the liberal use of paid sick leave as a reasonable accommodation while Gearhart's reasonable accommodation was pending.  *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (citing 29 C.F.R. § 1630.2(o) (Appendix) (2011)); *E.E.O.C. v. Manuf. and Traders Trust Co.,* 429 F. Supp. 89, 103 (D. Md. Dec. 19, 2019).

### 3.  Delay Between Notification and Implementation of Accommodation

Gearhart's next argument is that the defendants unreasonably delayed her accommodation.  Gearhart insists that the clock started in "mid-September" 2013 based on Gearhart's then-supervisor Beaver's deposition testimony.  Gearhart submitted a brief note from Dr. Kuiken on a prescription pad on September 27, 2013, and submitted her written request on September 30, 2013.  Gearhart's accommodation was approved on January 2, 2014, and implemented on March 9, 2014.  From notification to approval there were approximately 109 days, and from notification to implementation there were approximately 175 days.  For a 24-day period in November 2013, Gearhart was obtaining further medical documentation on RAB's request.  Gearhart's argument primarily relies on the VA policy that "[r]equests from employees should ordinarily be processed within thirty (30) calendar days, not counting the time waiting for medical documentation."  Using a mid-September date as the beginning marker for notification, there was just under three months from notification to approval, and five months from notification to implementation. [15]

The Fourth Circuit has explained that "[i]n some circumstances, an 'unreasonable delay' may constitute a denial of an accommodation."  *Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021); *see also*, *Farquhar* 814 F. App'x at 788 (citing *McCray v. Wilkie*, 966 F.3d 616, 620–21

---

[15] These calculations exclude the 24-day period that Gearhart sought additional medical documentation from Dr. Kuiken per the RAB's request.

(7th Cir. 2020); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262–63 (10th Cir. 2001)).

But "a relatively short delay of a few weeks (or even a few months) in approving a request

typically does not support such a claim." *Smith*, 12 F.4th at 415.  "Whether a particular delay

qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not

limited to, such factors as the employer's good faith in attempting to accommodate the disability,

the length of the delay, the reasons for the delay, the nature, complexity, and burden of the

accommodation requested, and whether the employer offered alternative accommodations."

*McCray*, 966 F.3d at 621.  Further, "a delay may be found reasonable where the record

demonstrates the accommodation request is under active consideration."  *Smith*, 12 F.4th at 415.

The court finds that the VA policy is not dispositive on the question of whether the delay

in processing Gearhart's accommodation was reasonable.  The policy first states that

accommodations should be processed "as expeditiously as feasible," before suggesting that

requests "should ordinarily" be processed within 30 days less time used to acquire medical

documentation.  This ambiguity suggests that the policy is not mandatory.

The court finds that the nature and burden of Gearhart's requested accommodation were

not simple or insignificant.  Gearhart's requested accommodation affected not only her own

schedule, but also the schedule of four other AODs.  The schedule was set months in advance

and accounted for previously requested vacation time.  Additionally, with one less AOD

engaging in swing shifts, it necessitated analyzing whether the duration of certain shifts needed

to change, for example from eight-hour shifts to twelve-hour shifts. Gearhart's request for a fixed

midnight shift had ripple effects on every other member of the team.  Requesting a fixed shift as

one of five members on a team that has the mission of providing around-the-clock coverage is not insignificant as to make a delay of more than 30 days unreasonable as a matter of law. [16]

Most importantly, as discussed above, Gearhart's supervisors allowed her to take paid sick leave for the entire time the accommodation was being considered and implemented. *Selenke*, 248 F.3d at 1263 ("[T]here is no indication that [the employer] refused any requests for leave from [plaintiff] during this time."). This arrangement shielded Gearhart from the cause of her symptoms while her accommodation request was being processed. Looking at the record, Gearhart never involuntarily worked a swing shift from the date of notification to the date of implementation. The court views this as good faith on behalf of defendants and sees no other evidence in the record of bad faith.[17] Given the arrangement during the period between notification and implementation, the court finds that the accommodation was not unreasonably delayed as a matter of law. Surveying case law, courts have found delays of a similar duration to not be unreasonable as a matter of law. *See, e.g., Hartsfield v. Miami-Dade Cnty.,* 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (several months); *Matos v. DeVos*, 317 F. Supp. 3d 489, 499 (D.D.C. 2018) ("about five months"); *Clayborne v. Potter*, 448 F. Supp. 2d 185, 192 (D.D.C. 2006) (twelve months).

"Importantly, to comply with the Rehabilitation Act, employers need not immediately implement or accept accommodations proposed by an employee. Nor must an employer move

---

[16] For further illustration, the VA policy provides several examples of reasonable accommodations including modifying a desk space, allowing telecommuting, allowing a service animal in the workplace, providing an assigned accessible parking space close to the building, or printing materials in large font. (Pl.'s Ex. 4 26, Dkt. No. 32-4.) It is not hard to imagine that all of these accommodations, which lack a direct impact on other employees, could be approved and implemented in short order. In this case, it was not simply a matter of changing Gearhart's start or end time.

[17] Other examples of good faith include Beaver walking Gearhart to HR herself to initiate an accommodation request and the RAB meeting within three weeks of Gearhart's initial request.

with maximum speed in addressing a request for accommodations." *Farquhar*, 814 F. App'x at 788 (internal citations omitted).  The employer must not unreasonably delay.  Here, the defendants have shown that the delay in this case is not unreasonable as a matter of law.

## D.  Discriminatory and Retaliatory Hostile Work Environment

Finally, Gearhart brings a claim against defendants for a discriminatory and retaliatory hostile work environment in violation of the Rehabilitation Act.  To establish a case for hostile work environment under the Rehabilitation Act, the plaintiff must prove: (1) unwelcome conduct; (2) resulting because of her disability; (3) which is sufficiently severe or pervasive to alter plaintiff's conditions of employment; and (4) which is imputable to the employer.  *See Pueschel v. Peters,* 577 F.3d 558, 564-65 (4th Cir. 2009).  "An employer is liable for harassment by the victim's coworkers 'if it knew or should have known about the harassment and failed to take effective action to stop it.'"  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (quoting *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006)).

A hostile workplace is one so "permeated with 'discriminatory intimidation, ridicule, and insult'" it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment."  *Bluey v. Charles Cnty., Maryland*, No. CV DKC 19-3163, 2020 WL 5203334, at *10 (D. Md. Sept. 1, 2020) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  "'A merely unpleasant working environment' does not suffice."  *Id.* (citing *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996)).

The Fourth Circuit has noted that plaintiffs must clear a high bar in order to support a finding that unwelcome conduct is severe or pervasive:

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints

19

> premised on nothing more than rude treatment by [coworkers],
> callous behavior by [one's] superiors, or a routine difference of
> opinion and personality conflict with [one's] supervisor, are not
> actionable . . . .

*E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (internal citations

omitted).  "[The severe or pervasive] element of a hostile work environment claim has both

subjective and objective components."  *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175

(4th Cir. 2009).  [W]hen determining whether the harassing conduct was objectively severe or

pervasive, we must look at all the circumstances, including the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at

176.

Gearhart's claim against defendants for a hostile work environment fails because the

unwelcome conduct clearly falls far short of being severe or pervasive.  Gearhart's workplace

complaints stem from interactions during October 2013 and June 2014.  The facts are in dispute

as to the initial meeting where the need to accommodate Gearhart arose, but the disputes are not

material.  Gearhart said she received insults, sarcasm, and venom from her coworkers; another

one of the AODs said the group was upset.  Beaver stated that there was sarcasm; however, she

testified that she responded by saying, "[W]ait a minute now.  That's not right.  Charlotte

[Gearhart] has just as much right to file a reasonable accommodation as anybody."  (Beaver Dep.

16:11–14, Pl.'s Ex. 6, Dkt. No. 32-6; Gearhart Dep. 58:15–20, Pl.'s Ex. 7, Dkt. No. 32-7. )  In

email correspondence in June 2014, two of Gearhart's fellow AODs said that Gearhart was not a

"team player," and one said that the other AODs sacrificed so Gearhart could have an "easy

schedule" that required less work.

In her deposition, Gearhart described her relationship with her fellow AODs after the

October meeting as follows:

> They wouldn't talk to me.  One time I had icing on my coat when I
> left.  One time they threw my lunch—we had a refrigerator in the
> ER break room.  They would throw my food away, somebody threw
> my food away, I don't know who.  I don't know who put icing on
> my coat.  They wouldn't talk to me or if they did they would walk
> by and say, how are you doing, and before I could even answer they
> would just keep on walking…. And sometimes they wouldn't give
> me information that I really need for my shift.  It was rare but there
> were times that there was information that they should have gave me
> that would have made my job easier.

(Gearhart Dep. 85:4–17, Pl.'s Ex. 7, Dkt. No. 32-7.)  Notably, in June 2014, Gearhart said via

email, "I enjoy my job and in working with each of you; I have never heard a complaint from

any of you regarding my work…"  (R. 00308, Dkt. No. 32-1.)

Primarily, "[Gearhart] merely complains of rude treatment by [her colleagues]—conduct

falling short of that required to sustain a hostile work environment claim."  *Baqir v. Principi*, 434

F.3d 733, 747 (4th Cir. 2006).  The evidence in the record, in a light most favorable to Gearhart,

is objectively not severe to support a claim of hostile work environment.  Further, the evidence

also lacks a showing of pervasiveness.  The alleged hostile environment was fostered over the

course of nine or ten months; however, most of the incidents are isolated to certain time periods

when scheduling was being discussed.  At most, Gearhart points to a handful of instances of rude

behavior during this time.  This is not the type of behavior that provides a basis for a hostile

work environment claim.  *Cf. EEOC v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001)

(manager sexually harassed the plaintiff "every single day"); *Ocheltree v. Scollon Prods., Inc.*,

335 F.3d 325, 333 (4th Cir. 2003) ("[The plaintiff] was subjected every day to some variety of

this offensive conduct . . . ."); *Iskander v. Dep't of* Navy, 116 F. Supp. 669, 677–78 (E.D.N.C.),

*aff'd,* 625 F. App'x 211 (4th Cir. 2015) (sporadic petty comments about plaintiff needing a chair,

faking her back pain, and eating malodorous lunches does not create a hostile work environment

under Title VII or the ADA); *Hoffman v. Brown*, No. 1:96CV225-C, 1997 WL 827526, at *6–7

(W.D.N.C. Oct. 24, 1997), *aff'd sub nom. Hoffmann v. Brown*, 201 F.3d 436 (4th Cir. 1999)

(false and written statement by coworkers about plaintiff's fitness for duty, behavior, personal

hygiene, and occupational competence were "isolated occurrences" and "amounted only to

offensive utterances and should not have impacted plaintiff's work environment as a whole").

As a matter of law, the court is satisfied that, even viewing the evidence in a light most favorable

to Gearhart, no reasonable jury could find that defendants created a discriminatory and

retaliatory hostile work environment.  Thus, the court will grant defendants' motion for summary

judgment with respect to the hostile work environment claim.

***

In sum, Gearhart cannot show as a matter of law that she suffered an adverse employment

action, that the defendants failed to reasonably accommodate her, or that she was subjected to a

hostile work environment.  Therefore, the court will grant the defendants' motion for summary

judgment in full.

**E.  Plaintiff's Motion for Summary Judgment**

As discussed above, the court has considered defendant's motion for summary judgment,

finding that there are no genuine issues of material fact, and defendant is entitled to judgment as

a matter of law.  The court has also considered plaintiff's motion for summary judgment.

Considering the record in a light most favorable to defendants and the legal analysis above,

Gearhart is not entitled to summary judgment because she cannot show as a matter of law that

she suffered an adverse employment action, that the defendants failed to reasonably

22

accommodate her, that she was subjected to a hostile work environment, or that defendants

retaliated against her.  Therefore, the court will deny plaintiff's motion for summary judgment.

### III.  CONCLUSION

For the reasons stated above, the court will deny Gearhart's motion for summary

judgment and grant the defendants' motion for summary judgment as to all claims.  The court

will issue an appropriate order.

Entered: September 30, 2022.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge